IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONNA J. THOMAS, Administratrix of the Estate of ANDRE THOMAS, Deceased, on behalf of the Estate of ANDRE THOMAS | ) ) ) ) CASE NO: 2:09-cv-00996-NBF |
| Plaintiff, | ) ) JURY TRIAL DEMANDED |
| v. | ) ) ) |
| BOROUGH OF SWISSVALE; DEBRA LYNN INDOVINA-AKERLY; JUSTIN LEE KEENAN; and GARY DICKSON | ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE THE EXPERT REPORT AND MEDICAL TESTIMONY OF DR. CYRIL WECHT

AND NOW come the Defendants, Borough of Swissvale, Debra Lynn Indovina-Akerley, Justin Lee Keenan, and Gary Dickson by and through their attorneys, Mark R. Hamilton and Cipriani & Werner, P.C., and file the within Brief in Support of their Motion to Exclude the Expert Report and Medical Testimony of Dr. Cyril Wecht.

### I.    Introduction

Plaintiff Donna J. Thomas, Administratrix of the Estate of Andre Thomas ("Thomas"), filed this action under 42 U.S.C. § 1983 seeking to recover for the use of excessive force allegedly utilized during Thomas' arrest on August 4, 2008 by Defendants, the Borough of Swissvale, Officers Debra Indovina-Akerley, Justin Keenan, and Gary Dickson. (*See* Doc. No. 3). Discovery closed on August 1, 2011 (Doc. No. 39), and Defendants now move to exclude the expert report and testimony of Plaintiff's expert, Dr. Cyril Wecht, under Federal Rule of Evidence 702.

## II.    Factual Background

Shortly before midnight on August 4, 2008, Borough of Swissvale police were dispatched by Allegheny County 911 to an area around 2240 Hawthorne Street after receiving a report of a man running between homes while shouting that someone was "after him" and he was going to be shot. (Doc. No. 3 at ¶¶ 14-17, 21-22; Exhibit A, Swissvale Police Department report at p. 4; Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 44-46, 49, 51-53). Defendants, Officers Indovina-Akerley, Dickson and Keenan responded to the area and observed Thomas, who was not wearing a shirt, running down the street in between houses towards Manor Drive while shouting excitedly. (Doc. No. 3 at ¶ 24; Exhibit A at p. 4; Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 59). Officer Keenan exited the police vehicle and began to follow Thomas on foot, at which time he yelled "they've got guns … don't shoot me." (Exhibit A at p. 4; Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 59-62, 64, 72). In his report, Keenan noted that Thomas exhibited signs of agitation, incoherence, paranoia, and constant motion. (Exhibit A at p. 4).

As Officer Indovina-Akerley arrived on foot to assist, Officer Keenan ordered Thomas to the ground. (Exhibit A at p. 4; Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 61-63, 65; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at pp. 19-20). Officer Dickson then arrived to assist while Keenan checked the area for other potential perpetrators. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp 65, 76; Exhibit D, Deposition Transcript of Officer Dickson at pp. 26-27). While Keenan checked the backyards of the homes, Indovina-Akerley and Dickson remained with Thomas on the street, who continued to yell and scream in an excited manner. (Exhibit B, Deposition Transcript of Officer Justin Keenan at p. 76; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at pp. 19-21, 44). After finding no

2

evidence of anyone in the rear of the homes, Keenan began to walk back to the street when he heard Indovina-Akerley instructing Thomas to stay on the ground and not move or he would be tased. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 68-70). When Keenan came out from between two homes, he saw Thomas running from Indovina-Akerley at which time Indovina-Akerley deployed her taser into Thomas' back. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 68-70; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at pp. 21-23, 26, 47-48). The probes made contact with Thomas' lower left back and left buttock and he fell to the ground. (*Id.*).

Indovina-Akerley then ordered Thomas to lie on his stomach and put his hands behind his back. (Exhibit B, Deposition Transcript of Officer Justin Keenan at p. 88; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at pp. 27-28). He complied as Officer Dickson joined his fellow officers and moved in from Thomas' right side in order to apply handcuffs. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 88-89; Exhibit D, Deposition Transcript of Officer Dickson at pp. 41, 44-47). As Dickson approached, Thomas pulled away and put his arms under himself in an attempt get up from the ground. (Exhibit D, Deposition Transcript of Officer Dickson at p. 47). Indovina-Akerley deployed the taser a second time and Thomas was ordered to place his hands behind his back again but refused to comply. (Exhibit B, Deposition Transcript of Officer Justin Keenan at p. 90-94; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at pp. 50-55). Dickson then grabbed Thomas' right arm and Keenan grabbed his left arm; together, they attempted to place his arms into a position where he could be handcuffed. (*Id.*). However, such an attempt failed as Thomas continued to struggle away from the officers. (*Id.*). The taser was utilized a third time, after which the officers were able to place

3

handcuffs on Thomas. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 95-96; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at p. 59).

While lying on his stomach handcuffed, Thomas continued to fight by kicking, "bucking his body" and rolling from side to side. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 97-100; Exhibit C, Deposition Transcript of Officer Indovina-Akerley at pp. 60-63). Keenan applied pressure to his shoulders with his hands while Dickson attempted to control his legs. (*Id.*). Keenan was thrown off by Thomas and then again applied pressure to his shoulders. (*Id.*). Keenan then knelt on Thomas' lower back with his knee for five to seven seconds after which Thomas began to be compliant. (*Id.*). The officers then removed their contact with him. (*Id.*). Thomas was observed breathing heavily by the officers when first responders arrived from the Swissvale Fire Department arrived and began to check Thomas' vitals. (Exhibit B, Deposition Transcript of Officer Keenan at p. 102-103; Exhibit E, Deposition Transcript of Kevin Morris at pp. 40-41, 46-47; Exhibit F, Deposition Transcript of Sean Hearn at pp. 13-15). The first responders noted that upon their arrival Thomas was breathing, making eye contact, and moving around. (Exhibit E, Deposition Transcript of Kevin Morris at p. 41, 46, 57; Exhibit F, Deposition Transcript of Sean Hearn at p. 13).

A few minutes later, Thomas vomited a clear liquid with some particles in it after which he was observed to be breathing, although his respirations were "getting shallower." (Exhibit F, Deposition Transcript of Sean Hearn at pp. 15-16). Within five to seven minutes of Mr. Hearn and Mr. Morris' arrival and during their assessment, Eastern Area Pre-Hospital Services ("EAPS") arrived and Keenan removed the taser probes and handcuffs. (*Id.* at 15-18; Exhibit B, Deposition Transcript of Justin Keenan at pp. 104-105; Exhibit E, Deposition Transcript of Kevin Morris at p. 45). Thomas then went unresponsive and was moved to an ambulance where

CPR was administered. (Exhibit F, Deposition Transcript of Sean Hearn at pp. 44-46). Defendants and other officers who arrived on the scene to assist began to interview witnesses in order asses the cause of Thomas' actions. (Exhibit B, Deposition Transcript of Officer Justin Keenan at pp. 53-55, 107-108; Exhibit A at pp. 8-10). Thomas was transported to UPMC Braddock Hospital, where he was pronounced dead at 12:46 a.m. (Exhibit A; Exhibit B, Deposition Transcript of Officer Justin Keenan at p. 109).

The Allegheny County Medical Examiner, Drs. A. Shakir and Karl Williams determined that Thomas died as a result of agitated delirium due to acute cocaine intoxication. (Exhibit G, County of Allegheny Autopsy Report). They also determined that Thomas suffered external trauma with no evidence of internal vital organ injury, while "[n]o petechial hemorrhages are noted." (*Id.* at 3). On January 12, 2011, Dr. Cyril Wecht authored a report at the request of the Plaintiff after reviewing the following: (1) the ME's autopsy report; (2) the Swissvale police report; and (3) findings made during his own private autopsy on August 9, 2008. (Exhibit H; Report of Dr. Cyril Wecht dated January 12, 2011 and Autopsy Report dated August 9, 2008). Ultimately, he opines that Thomas died as a result of positional asphyxiation, while noting the presence of cocaine and ethanol. (*Id.*).

## III.   Controlling Legal Standard under Fed. R. Evid. 702 and *Daubert*

The Supreme Court's landmark case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is memorialized in Federal Rule of Evidence 702 which provides the basic test for the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Although Rule 702 was amended in 2000 in response to *Daubert*, the

precedent prior to that amendment also applies to the analysis under Rule 702. *See Pineda v.*

*Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). Under Rule 104(a), the court must make

preliminary determinations regarding whether the proposed expert is qualified and whether the

evidence is admissible so as to assure that the testimony meets the minimum requirements of

reliability and relevance. *See Holbrook v. Lykes Bros. Steamship Co, Inc.*, 80 F.3d 777, 780-81

(3d Cir. 1996).

The Court of Appeals for the Third Circuit has set forth the lens through which to view

reliability:

> The reliability requirement … should not be applied too strictly.
> Helpfulness to the trier of fact remains the ultimate touchstone of
> admissibility. If the expert has 'good grounds' for the testimony,
> the scientific evidence is deemed sufficiently reliable. A
> determination that the expert has good grounds assures that the
> expert's opinions are based on science rather than 'subjective
> belief or unsupported speculation.'

*Holbrook*, 80 F.3d at 784 (citing to *Daubert*, 509 U.S. 579, 589-90). The Court of Appeals for

the Third Circuit has further expounded upon the reliability requirement as follows: "the expert's

opinion must be based on the 'methods and procedures of science.'" *In re Paoli R.R. Yard PCB*

*Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

The "fit" requirement of an expert's testimony requires that the testimony "be relevant

for the purposes of the case and must assist the trier of fact." *Calhoun*, 350 F.3d at 321(citing

*Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)). "Rule 702's helpfulness standard [i.e. the

fit requirement] requires a valid scientific connection to the pertinent inquiry as a precondition to

admissibility." *Daubert*, 509 U.S. at 591-92. This inquiry addresses the question of relevance

because an expert opinion that is unrelated to a disputed issue is not relevant and cannot assist a jury as required by Rule 702. *Id.*

## IV.   Argument

Defendants do not dispute that Dr. Wecht qualifies as an expert in pathology. Nor do they dispute that Dr. Wecht has submitted testimony regarding matters requiring scientific, technical or specialized knowledge within the confines of Federal Rule of Evidence 702. Rather, Defendants contend that Dr. Wecht's opinion should be excluded because it is wholly unreliable. Specifically, his opinion is based upon invalid medical science and is result-oriented rather than based upon the historical facts of the incident on August 4, 2008. To this end, he did not follow proper forensic pathology protocol, including investigating the scene, reviewing complete police and investigators' reports, and reviewing third-party witness statements from, *inter alia*, the residents on Hawthorne Street. (*See* Exhibit I, Deposition Transcript of Dr. Cyril Wecht at pp. 9-11).

### A. The Concept of Positional Asphyxiation Fails Under Rule 702

As discussed earlier, in order for expert testimony to be admissible, the method and reasoning used in formulating the opinion must be reliable. The Court of Appeals has delineated a non-exhaustive list of factors that should be considered, which may include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence or maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which may have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48 (3d Cir. 2008)(citing *States v. Downing*, 753 F.2d 1224 (3d Cir. 1985); and *Paoli*, 35 F.3d at 742 n.8). "Depending on the nature of the issue,

the expert's particular expertise, and the subject of his testimony," not every factor will be pertinent in assessing reliability so long as the expert's opinion has "'a reliable basis in the knowledge and experience of his discipline.'" *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 148-150 (1999)(quoting *Daubert*, 509 U.S. at 592).

Plaintiff seeks to rely on Dr. Wecht's expert testimony to establish that Thomas died as a result of positional asphyxiation.[1] Dr. Wecht testified that positional asphyxiation occurs when pressure is applied to the neck and/or back area, usually for a period of a couple of minutes resulting in a diminished amount of oxygenation because of the compromised function of the lungs, which can lead to cardiac arrhythmia and death. (Exhibit I, Deposition of Dr. Wecht at pp. 54-57, 67-68). A "classic component" of asphyxiation is interference with respiratory function. (*Id.* at p. 64; *see also* Exhibit J, Report of Dr. Theodore C. Chan, dated March 12, 2011).

The work of Dr. Donald T. Reay, the scientist credited with first hypothesizing the notion of positional asphyxiation in 1988,[2] has been held to be successfully refuted by Dr. Thomas Neuman, a researcher from the University of California at San Diego Medical Center, along with various other medical professionals.[3] Dr. Neuman refuted both the premise that blood oxygen levels decrease after exercise – or for purposes of this case when a person is suffering from agitated delirium – and the ultimate conclusion that being restrained in a prone position prevents the lungs from replenishing the blood's oxygen supply. In other words, Dr. Neuman determined

---

[1] A person may die from asphyxia as a result of chest compression. Spitz and Fisher, *Medicological Investigation of Death* 444, 484 (3d ed. 1993).

[2] *See* Donald T. Reay, et al. *Effects of positional restraint on oxygen saturation and heart rate following exercise*, 9 Am. J. Forensic Med. & Pathology 16 (1989), attached as Exhibit K.

[3] *See* Tom Neuman, Theodore Chan, et al., *Restraint Position and Positional Asphyxia*, 30 Annals of Emergency Med. 578 (1997); *see also* Theodore Chan, et al., *Reexamination of custody retrain position and positial asphyxia*, 19(3) Am. J. Forensic Med. & Pathology 210 (1998); C.S. Hirsh, *Restrain Asphyxiation*, 15 Am. J. Forensic Med. & Pathology 266 (1994).

that the impairment by the hogtie position is so minor that it does not lead to asphyxia, and in fact has no practical significance.[4] These findings have been confirmed by other independent investigators in relation to individuals in similar positions, including by Defendants' expert, Theodore Chan, M.D., F.A.C.E.P. (Exhibit J, Dr. Chan's Report at p. 2). The record in this case unequivocally established that Thomas was not subjected to a hogtie maneuver; rather, a simple prone position with the cuffing of his wrists. On this point, Dr. Wecht testified that the hogtie prone position is a different position than the position of Thomas, and that the hogtie prone position tends to compromise respiratory function more than just the prone position. (Exhibit I at pp. 123-124).

Dr. Reay has conceded that a restraint such as the one hypothesized by Dr. Wecht, where the individual is lying face down with his arms cuffed behind is back,[5] does not produce any

---

[4] Defendants acknowledge that Dr. Neuman's study did not replicate the circumstances of Thomas' death perfectly. For example, Dr. Neuman's subjects did not have cocaine in their systems. To the extent that Plaintiff attempts to argue that any difference in circumstance means that the Neuman study does not apply to Thomas, such an argument does not help Plaintiff for several reasons.

Despite the differences, the study illustrated simple, basic physical principles – that the hogtie restraint while it impacts breathing, does not affect blood gas levels. Dr. Neuman's study is more applicable to Thomas than Dr. Reay's studies, which Dr. Reay conceded were methodologically and logically flawed. Lastly, no one knows what effect factors such as cocaine would have on a person in the hogtie or prone position. In light of this uncertainty, Plaintiff cannot establish that factors such as cocaine and its effects on an individual made the prone restraint particularly dangerous to Thomas.

[5] Dr. Reay's study and Dr. Neuman's refutation both specifically focus on the hogtie restraint, a restraint more strenuous than the one used on Thomas. In the hogtie restraint, the person is placed in a prone position and his ankles and wrists are "tied" together above him. The resulting position produces a minor level of chest compression. Intuitively, if the hogtie restraint does not affect respiration, a less severe prone restraint, such as the position of Thomas, would not either. (*See also* Exhibit I, at p. 124).

9

serious or life-threatening respiratory effects[6] and is "physiologically neutral." (*Id.* at pp. 2-3); *see also Price v. County of San Diego*, 990 F.Supp. 1230, 1998 U.S. Dist. LEXIS 9397 (S.D. Cal. 1998); *see also Lewis v. City of Hayward*, Civ. A. No. 03-5360, 2006 U.S. Dist. LEXIS 9976, at *23-24 (N.D. Cal. 2006)(challenged expert's testimony regarding asphyxia was permitted because he did not rely on Dr. Reay's theory in concurring that "the state of being prone and with his hands being restrained … it's not felt that that in itself is enough to compromise a person's respiration enough to kill them."). All of the medical professionals who have endorsed the concept of positional asphyxia have relied on Dr. Reay's work, to some degree, which has been proven methodologically and logically flawed. As a result, the evidence and medical literature following it have fallen completely.

Dr. Reay's eviscerated theory is the crumbling foundation for Dr. Wecht's ultimate opinion on the cause of death. Dr. Wecht has not offered his own published study on positional asphyxiation nor conducted his own study as support for his conclusion regarding Thomas;[7] in conjunction with being aware of Dr. Reay's theory, he testified that he relied on his own experience and knowledge rather any specific article or study. (Exhibit I at pp. 119-120). Thus, Plaintiff cannot even argue that Dr. Wecht used a differently methodology or reasoning apart from Dr. Reay. Concerning Dr. Reay's work, in response to questioning about studies that support the theory since Dr. Reay's original study in 1988, Dr. Wecht testified:

---

[6] *See* Donald T. Reay, *Death in custody*, 18(1) Clinics in Lab. Med. 1 (1998), attached as Exhibit L. Dr. Reay also conducted studies in 2004 and 2007, which were unrelated to any pending litigation. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434-35 (6th Cir. 2007). (considering the *Daubert* factor of scientific studies being "expressly" or solely" prepared for purposes of testifying).

[7] Dr. Wecht also has not participated in any formal scientific study nor issued a publication on the condition of excited or agitated delirium, while he has provided discussion on the topic in other written work. (Exhibit I, Deposition of Dr. Cyril Wecht at p. 37-38).

> Yes, I do believe that there are articles and case reports and
> individual experiences that have been reported, and so on, to
> indicate that. I do not believe that this is an entity, a pathological
> phenomenon that was discovered and solely described by Dr.
> Donald Ray [sic]; that nobody had noticed anything before and
> more significantly and relevantly since that time that nobody has
> known or experienced or referred to such a state. No, I believe that
> is out there. And again, while it's admittedly indirect, I think that
> when one just stand back and accepts the unequivocal,
> unquestioned reality of an almost universal acceptance of this
> potential death-producing kind of physical situation when police
> officers are involved, by law enforcement agencies, from the
> highest levels of federal government on down into the smallest of
> police forces, I must say, that to me is more significant than any
> scientific report.

(Exhibit I at p. 121). Dr. Wecht admitted to being aware that Dr. Reay recanted his position in
1998 and could not identify any medical or scientific study since then that would contradict the
refutation of Dr. Reay's theory or support his own definition or concept of positional
asphyxiation. (*Id.* at pp. 124-126). However, he continues to incorrectly assert that the concept
of positional asphyxiation is universally accepted.

For the reasons, Plaintiff's proffered report and testimony of Dr. Wecht's, which relies
primarily upon uncorroborated science, is not reliable within the purview of *Daubert* and Rule
702 and, therefore, must be excluded.

### B. Dr. Wecht's Findings and Diagnosis Are Contrary to his Own Definition of Positional Asphyxiation

Even if the "junk science" aspect of Dr. Wecht's opinion is ignored, Dr. Wecht's opinion
is inconsistent with the purported medical literature and/or theories upon which he relies.

Dr. Wecht defines asphyxiation as involving pressure to the neck and back area in order
to compromise lung function (Exhibit I at pp. 54-57, 67-68). Evidence of this may be derived
from pin-point hemorrhaging in the eyes, known as petechial hemorrhages, and focal areas of
hemorrhaging in the back muscles or subcutaneous tissues. (*Id.* at pp. 52-53, 75). In Thomas'

11

case, Dr. Wecht testified that during his private autopsy, he found no signs of trauma to the neck and back area indicating pressure or force by the Defendant officers while he noted in his report that "no well-defined petechial hemorrhages are seen," which coincides with findings of the Allegheny County Medical Examiner. (*Id.* at pp. 72-73, 93; Exhibit H, Dr. Wecht's report at p. 7; Exhibit G, Allegheny County Autopsy Report at pp. 3, 12). He further stated that he has no basis to disagree with the Medical Examiner's finding of no hemorrhages or trauma to the soft tissues of the neck, chest or abdominal wall, or subcutaneous tissues. (Exhibit I, Deposition of Dr. Wecht at pp. 74-75, 89).

Dr. Wecht did find evidence of hemorrhaging in the lower back/lower thoracic into the lumbar region of the spine, i.e. the belt level of an individual, indicating pressure being applied to that area of the body. (*Id.* at pp. 78-79; *see also* Exhibit H at pp. 10-11). Specifically, Dr. Wecht stated his finding of hemorrhaging on both the top and bottom of the penis is consistent with asphyxiation. (Exhibit I at pp. 123-124; *see also* Exhibit H at p. 16). To the extent that his conclusion of positional asphyxiation is based upon these findings, his testimony is inconsistent with his prior testimony that asphyxiation involved pressure to the area of the back where the lungs are located and respiratory functions occur. (*Id.* at pp. 78-79, 84-85). To this end, the officers and emergency medical personnel witnessed Thomas breathing for several minutes after the struggle, during which minimal weight force was applied to his lower back and he had been handcuffed, and prior to going unresponsive. Dr. Wecht did not consider the fact that after the officers removed their contact with him but prior to the cessation of his breathing, Thomas was observed violently rolling on the ground from side to side and bucking. Therefore, based on the historical information provided to him, Dr. Wecht was not given the opportunity to rule out other causes of the hemorrhaging in the lower thoracic region.

In consideration of the foregoing, Dr. Wecht's opinions and testimony are neither founded upon a reliable basis nor in accordance with generally accepted methods. His report and testimony must be excluded.

### C. Dr. Wecht's Methodology Fails to Consider Pertinent Facts

Notwithstanding the above arguments, Dr. Wecht's report and testimony must excluded because it is wholly inadequate and not based on the entire historical factual record of the August 4, 2008 incident. In reaching his ultimate conclusion, Dr. Wecht based his conclusions only a viewing of the body itself, Drs. Shakir and Williams' autopsy report, and "police investigative reports," which consisted of the report prepared by the Swissvale Police Department. (Exhibit H, Dr. Wecht's Report at p. 1; Exhibit I, Deposition of Dr. Wecht at pp. 9-11). He did not investigate the scene, review the Borough of Swissvale entire police investigation file, incident and witness statements, color photographs, the EAPS's trip report, Swissvale Fire Department's report, Miller School of Medicine pathology report, the UPMC Braddock Hospital records, or any of the various deposition testimonies that were available for his use when he wrote his report in January 2011. (Exhibit I at pp. 9-11, 87; *see also* Exhibit J, Dr. Chan's report at p. 1).

The following are highly pertinent facts not provided to Dr. Wecht for his evaluation:

- Kevin Morris, one of the first responding emergency medical personnel, testified that upon his arrival Thomas was lying on his side, not responding to verbal commands, and was breathing although it was labored. (Exhibit E, Deposition Transcript of Kevin Morris at pp. 40-45).

- Mr. Morris further testified that for being handcuffed, labored breathing is normal. (*Id.* at pp. 44-45). He assessed Thomas who was breathing and had a pulse minutes after the police had removed any physical contact with him. (*Id.* at pp. 56-57).

- Sean Hearn, another first responder with the fire department who has EMS training, assisted with the initial assessment of Thomas and observed Thomas moving around on the ground and blinking. (Exhibit F, Deposition Transcript of Sean Hearn at pp. 13-15).

13

- When Mr. Hearn first arrived, he witnessed Thomas rolling a couple of times while he lay handcuffed on the ground. (*Id.* at p. 42). Thomas' pulse was normal. (*Id.* at p. 14).

Dr. Wecht testified that a conclusion can be reached as to positional asphyxiation when you have two or more officers subduing an individual and there is evidence of force having been applied with soft tissue hemorrhage; thus, ruling out other causes. (Exhibit I at pp. 44-45). In order to reach a conclusion as to the cause of death, Dr. Wecht has previously testified under oath that injuries alone cannot suggest a cause of death. (Exhibit M, Trial Testimony of Dr. Cyril Wecht in the matter of *Commonwealth v. Mulholland, et al.*, on October 17, 1996, at p. 2). In addition to the autopsy reports and any other medical report, Dr. Wecht states that he would obtain "as much information as was available to him," including a full medical history and investigative reports. (*Id.* at pp. 3-6). Included in this information is the decedent's medical history and investigative reports. (*Id.* at pp. 4-6); *see also* Donald T. Reay, *Positional Asphyxia During Law Enforcement Transport*, Am. J. of Forensic Med. & Pathology 13(2): 90-97, 94, 97(1992)(a conclusion of positional asphyxia "is drawn from the totality of the investigation and depends on historical information and reconstruction of events. These deaths can only be properly evaluated with knowledge of the dynamics of the events preceding and surrounding death."), attached as Exhibit N.

In this case, however, Dr. Wecht was not provided with the full background as to what occurred, specifically, full incident reports, witness statements, and Thomas' medical history. Conversely, Dr. Wecht referred to prior cases involving opinions on asphyxiation in which eye witness accounts as to the deceased out in the field and independent investigative reports were considered in order to properly determine the cause of death. (Exhibit I at pp. 46-47). For example, Dr. Wecht referred to the Jonny Gammage matter in which such information was

14

considered, as well as evidence of hemorrhaging in the back and chest muscles which corroborated eye witness accounts of pressure being applied to the back. (*Id.* at pp. 50-51). Here, there is no such evidence of pressure to Thomas' chest as demonstrated by both Dr. Wecht's and the Medical Examiner's autopsy reports. Nor has there been any testimony of record that pressure was applied to Thomas' chest and upper back. Dr. Wecht admitted that without such information, he would have no basis to "be thinking about" positional asphyxiation.[8] (*Id.* at 48-50). It is questionable whether Dr. Wecht's opinion would have been different had he been aware when he wrote his report that Thomas had rolled back and forth while he laid in the prone position. This is vital in light of officers' testimonies that the only pressure they applied to Thomas was to his lower back for 5-7 seconds while they were attempting to place handcuffs on him. In addition, Dr. Wecht admitted that he was not provided a full medical history of Thomas prior to completing his report. (Exhibit I at pp. 109-112).

Dr. Wecht's ultimate conclusion in this matter is fatally flawed because he did not follow proper methodology, including his own methodology, in reaching an opinion as to the cause of death. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000("Admissibility depends in part upon the 'proffered connection between the scientific research or test result to be presented and … [the] **factual issues** in the case.'")(emphasis added). As a result, his report and testimony are inadmissible pursuant to *Daubert*'s standards and Rule 702.

### D. Dr. Wecht Must Not Be Permitted to Testify as to Proper Police or Emergency Medical Response

---

[8] It is further evident through his own testimony that Dr. Wecht was confused about the factual background of the August 4, 2008 incident, as he testified in one moment that the Swissvale report references pressure to the neck and back which is he found supportive of his asphyxiation opinion, then subsequently admits after reviewing the report again that pressure was only applied to the shoulders. (Exhibit I at pp. 94-96, 98-99).

In his report, Dr. Wecht challenges excited delirium as scientifically uncorroborated, but then offers that if Thomas was exhibiting such a state, the Swissvale police officers' response was not "cautious, conservative and calm … as such an individual should not be approached in an aggressive, antagonistic and confrontational fashion." (Exhibit H, Dr. Wecht's Report, at p. 2). Plaintiff's expert should not be permitted to discount the Medical Examiner's diagnosis in one sentence, and then attempt to utilize that diagnosis for a secondary opinion as to the propriety of the officers' emergency response.

Furthermore, although highly experience and qualified in the field of pathology, Dr. Wecht is not an emergency physician or trained in emergency medicine. To this end, he has not participated in any study or authored any publication as to the continuum of force, nor has he been called upon to give expert testimony as to proper police procedures. (Exhibit I, Deposition of Dr. Wecht at pp. 19, 23-26).

Therefore, Dr. Wecht must not be permitted to provide any opinion as to the propriety of the Defendant police officers' response to the situation presented by Thomas' actions on August 4, 2008, as he is not qualified to offer any such opinion under Rule 702.

## V.   Conclusion

For the foregoing reasons, Defendants respectfully request that this Honorable Court grant their Motion to Exclude the Expert Report and Medical Testimony of Dr. Cyril Wecht pursuant to *Daubert, supra* and Federal Rule of Evidence 702.

Date:  September 1, 2011                    Respectfully submitted,

                                            CIPRIANI & WERNER, P.C.

                                            BY:   */s/ Mark R. Hamilton*
                                            MARK R. HAMILTON, ESQUIRE
                                            PA ID #29919

16

CIPRIANI & WERNER
SUITE 700
650 WASHINGTON ROAD
PITTSBURGH PA  15228

Attorneys for the Defendants,
BOROUGH OF SWISSVALE; DEBRA;
LYNN INDOVINA-AKERLY; JUSTIN
LEE KEENAN; and GARY DICKSON

17