IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONNA J. THOMAS, ADMINISTRATRIX OF THE ESTATE OF ANDRE THOMAS, DECEASED, ON BEHALF OF THE ESTATE OF ANDRE THOMAS, ) ) ) ) ) | |
| Plaintiff ) | Civil Action No. 09-996 |
| ) V. ) | Judge Nora Barry Fischer |
| ) BOROUGH OF SWISSVALE, DEBRA LYNN INDOVINA-AKERLY, JUSTIN LEE KEENAN and GARY DICKSON, ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants ) | |

## DEPOSITION TRANSCRIPT EXCERPTS

## OF

## ABDULREZAK SHAKIR, M.D.

## EXHIBIT 2

## TO

**PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DEBORAH MASH, PH.D. AND ANY EVIDENCE REGARDING AN ALLEGED CONDITION REFERRED TO AS EITHER EXCITED DELIRIUM, AGITATED DELIRIUM AND/OR DRUG-INDUCED DELIRIUM**

```
 1           IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
                         - - -
 3
    DONNA J. THOMAS, Administratrix   )
 4  of the Estate of ANDRE THOMAS,    )
    Deceased, on behalf of the Estate )
 5  of ANDRE THOMAS,                  )
                                      )
 6                     Plaintiff,     )
                                      )Civil Action
 7       vs.                          )
                                      )No. 2:09-cv-996-NBF
 8  BOROUGH OF SWISSVALE; DEBRA LYNN  )
    INDOVINA-AKERLEY; JUSTIN LEE      )
 9  KEENAN; and GARY DICKSON,         )
                                      )
10                     Defendants.    )

11                       - - -

12         DEPOSITION OF ABDULREZAK SHAKIR, M.D.

13                MONDAY, JULY 18, 2011

14

15         Deposition of ABDULREZAK SHAKIR, M.D.,

16  called as a witness by the Plaintiff, taken pursuant

17  to Notice of Deposition and the Federal Rules of Civil

18  Procedure, by and before Joy A. Hartman, a Registered

19  Merit Reporter and Notary Public in and for the

20  Commonwealth of Pennsylvania, at the offices of County

21  of Allegheny, Office of the Medical Examiner, 1520

22  Penn Avenue, Pittsburgh, Pennsylvania, commencing at

23  1:30 p.m. on the day and date above set forth.
```

```
                                                    9
 1           MR. MESSER:  Several.
 2      A.   Several of them. At least several of them. I
 3   don't remember.
 4      Q.   Ten? Less than ten?
 5      A.   It can be ten. It can be, yes. More than ten.
 6      Q.   But less than 20?
 7      A.   I really don't have an idea.
 8      Q.   Now, during the time that you performed
 9   autopsies for the Medical Examiner's Office and the
10   Coroner of Allegheny County, was it your under-
11   standing that as the prosector on the cases, you were
12   to determine the cause of death of the unfortunate
13   deceased?
14      A.   Yes.
15      Q.   Is this done just by yourself, or is there a
16   process by which the Medical Examiner's Office
17   undertakes to review the autopsies that are performed
18   by the forensic pathologists here?
19      A.   That question, I have to explain. In some
20   occasions where the cause of death is obvious, I
21   determine that on the autopsy, and it will be my
22   determination, and the Medical Examiner will be
23   reviewing my report at the end.
```
```
                                                   10
 1           In some cases where there are questions to be
 2   asked and we want to go for further investigation on
 3   the case, whether it is medical investigation or
 4   whether it is other investigations, most of the time,
 5   I will leave the cause of death at the end of the
 6   autopsy as "pending this investigation."
 7           In these situations and in some other
 8   situations like that, complicated situations, in these
 9   situations, I might discuss that with the Medical
10   Examiner, and I might even discuss it with other
11   pathologists before reaching the determination.
12           But in general, it is my responsibility to
13   determine the cause and manner of death of that
14   individual.
15      Q.   So would it be fair to say if somebody comes in
16   with a gunshot wound between the eyes, it is fairly
17   obvious what happened?
18      A.   That's what we say, yes. In some such
19   situation, I will not leave the cause of death as
20   pending other investigation, because it is obvious.
21   The manner of death might be pending other
22   investigation, but this is obvious.
23           But in cases where there are multiple factors
```

```
                                                   11
 1   working, where there is no quick possibility of a
 2   definite determination, in these cases, we usually --
 3   the pathologist will leave it as pending whatever
 4   investigation, and then later on, we reach that.
 5      Q.   In fact, that was the situation in the André
 6   Thomas case; is that right?
 7      A.   Yes. That is the situation in the André Thomas
 8   case, and in multiple of these in-custody deaths.
 9   Usually, it is not quite obvious.
10           The only time it is obvious is like when the
11   police shoot the individual, and that is the easy
12   ones.
13      Q.   Sure. Well, you are obviously experienced in
14   stating the cause of death after your autopsies, after
15   consultation or without, correct?
16      A.   Yes.
17      Q.   In this situation that we are here today about,
18   which is namely Mr. André Thomas, did you reach the
19   determination as to cause of death, or did Dr.
20   Williams reach the determination as to cause of death?
21      A.   I will put it this way: I reached the
22   determination as to the cause of death after
23   discussing the case with Dr. Williams. He is the
```

```
                                                   12
 1   Medical Examiner, and we both agreed on this.
 2      Q.   Now, had you ever in any other case established
 3   the cause of death of an individual in any situation
 4   as being the cause of death you ascribed for André
 5   Thomas as agitated delirium?
 6      A.   Yes.
 7      Q.   On how many different occasions had you done
 8   that?
 9      A.   I remember at least two or three situations.
10      Q.   Now, you are aware that there is a great deal
11   of controversy about agitated delirium and excited
12   delirium, true?
13           MR. HAMILTON:  Object to the form.
14      A.   Yes.
15      Q.   Do you consider yourself or is the Medical
16   Examiner's Office capable of diagnosing either
17   agitated or excited delirium in-house?
18           MR. HAMILTON:  Object to the form.
19      A.   Yes. We have done this diagnosis before. We
20   might consult with other places, like in this
21   situation. For example, we sent specimens from the
22   brain to this laboratory down in Florida, who they
23   have certain tests which they can decide whether it is
```

### Page 25

cocaine in the benoylegonine, which is also another --
that is another active metabolite of cocaine, so
definitely, he was under the influence of cocaine, and
cocaine by itself can cause him to go into arrhythmia
and death.

Q. Then if you had that information, why did you
put one cause of death in the autopsy report being
agitated delirium?

A. I did not put only agitated delirium. I put
agitated delirium as a result of acute cocaine
intoxication. So I put acute cocaine intoxication.

Q. And "acute" just means immediate, right?

A. Yes.

Q. Now, what led you to the diagnosis of agitated
delirium?

A. It is --

Q. What facts did you have in your possession that
led you to the diagnosis of agitated delirium as the
cause of death?

A. From the clinical information that I have
received, our information goes with the diagnosis of
agitated or excited delirium.

Q. What was the clinical information, then, that

### Page 26

you had?

A. The clinical information is that an
individual --

(Off the record for cell phone interruption.)

A. -- is that an individual who is -- an
individual who was agitated, incoherent, going around,
knocking on doors of houses, stating that there are
people going to get him, or there are people going to
kill him, and those individuals who saw him, they are
the individuals who call 911; and then everybody came,
and then the police and the others came.

Q. Anything else?

A. The information that I get from the police is
the same as I get about him being incoherent and
agitated and shouting and all this.

Q. Is that type of behavior consistent with, for
example, neurotic or psychotic behavior?

A. It is psychotic in a way, and it can be seen in
individuals under certain drugs like cocaine.

Q. Is there any indication in any of the
information you received that Mr. Thomas attacked the
police or confronted the police or in any way
committed a crime?

### Page 27

MR. HAMILTON: Object to the form.

A. No.

Q. Why was it in this case that you sent samples
or slides of Mr. Thomas' body, and I think it was only
the brain, wasn't it?

A. Yes, the brain.

Q. To Miami to be examined by Dr. Mash?

A. Dr. Mash is conducting a study differentiating
excited delirium due to cocaine or excited delirium
not due to cocaine, and we started sending samples to
her in that respect.

Q. How many samples have you sent to her? Have
you sent -- other than André Thomas' case, have you
sent other samples to her?

A. Yes.

Q. On how many different occasions?

A. I don't remember, because some of them might be
cases that I worked on, and some of them might be
cases other pathologists worked on.

Q. What do you understand that she does when she
receives these slides, if you know?

A. She conducts a study regarding the receptors in
the brain, and according to the receptors, she reach

### Page 28

that conclusion -- According to her, she reached the
conclusion that it was delirium.

Q. Why did you feel it was necessary to give this
information to her?

A. In our -- when we are trying to reach the cause
of death, the cause and manner of death, we try to get
whatever help we can get or whatever assistance or
clarification. She was doing this study, and we felt
that it might be a confused to us to send.

Q. As you know, this case had some publicity
surrounding it.

A. Most of these cases have some publicity
surrounding them.

Q. And Dr. Williams in the press, and I'm not sure
you were ever quoted, indicated that they were not
going to release the cause of death until the studies
were completed in Miami.

A. He might have said that, yes.

Q. Why was he waiting on those studies? If you
had already reached a diagnosis or a cause of death,
why was he waiting for those studies?

A. We did not reach the diagnosis until after we
get all of those studies.

29
1    Q.  Did all of the studies that you made then
2    confirm this cause of death?
3    A.  I believe so, yes.
4    Q.  And Dr. Mash's report confirmed that, as well,
5    true?
6    A.  Yes.
7    Q.  What other studies were there beside Dr. Mash?
8    A.  The toxicology.
9    Q.  Positive for ethanol and cocaine?
10   A.  Yes, and for cocaine, yes.
11   Q.  At the point that you knew he had acute cocaine
12   toxicity, why didn't you diagnose his death then?
13   A.  If this was 1990, I would have diagnosed it at
14   that time; but the more science gets complicated and
15   the more there are more specialized studies of these
16   things, we will try to make use of them.
17   Q.  So is it fair to say without Dr. Mash's report
18   you would not have diagnosed him as a death caused by
19   acute agitated -- I'm sorry -- agitated delirium?
20        MR. HAMILTON:  Object to the form.
21   A.  I would -- without her report, I would diagnose
22   it as cocaine intoxication, as death due to acute
23   cocaine intoxication. To me, using the term agitated

                  JOHNSON and MIMLESS
                     (412) 765-0744

                                                                30
1    delirium or not agitated delirium does not really have
2    that much importance. To me, this is a complication
3    of acute cocaine intoxication.
4    Q.  I just want to ask you, Doctor, I think you
5    have in front of you the autopsy report of August 5,
6    2008, Case No. 08C0R04828, which I believe relates to
7    André Thomas; is that correct?
8    A.  Yes.
9         MR. MESSER:  Do you all have a copy? This
10        will be No. 1.
11        (Shakir Deposition Exhibit No. 1 was
12   marked for identification.)
13   Q.  Do you know, again, of any studies that measure
14   the impact of a TASER on a person who has used
15   cocaine?
16   A.  Specifically on a person who has used cocaine,
17   I don't remember of any study of this type.
18   Q.  The reason I am asking is that in this
19   situation, I think your records reflect that he was
20   Tasered.
21   A.  Yes.
22   Q.  And some of the records reflect that he was
23   Tasered one time. In fact, he was Tasered three

                  JOHNSON and MIMLESS
                     (412) 765-0744

                                                                31
1    times.
2    A.  In fact, the police report indicated that he
3    was Tasered three times. The point of insertion of
4    the tip of the TASER on him, I only saw one, and it
5    could be one, and then --
6    Q.  I am not trying to say you are wrong in your
7    report. I am just saying can we agree it was three
8    times?
9    A.  Yes.
10   Q.  I mean, he was shot once, and then they pulled
11   the trigger three times?
12   A.  Yes. It was three times.
13   Q.  That is what you meant to say?
14   A.  Yes.
15   Q.  Now, do you know from your personal knowledge
16   whether or not there has been any attempt to determine
17   the impact of multiple TASERs on a person who displays
18   the symptomatology of what we have called agitated
19   delirium?
20   A.  In general, there are a lot of studies
21   regarding the TASER's effect and the safety in regard
22   to the TASER's effect; and there were animal
23   experimental studies, there were mainly animal

                                                                32
1    experimental studies in regard to arrhythmias after
2    TASERs with these things. So there are a lot of
3    studies in this respect.
4    Q.  And there are studies that show that the TASER
5    can cause arrhythmias?
6    A.  There are studies that believe that the TASER
7    can cause arrhythmias, and especially if the TASER
8    happened in certain areas of the body, which is in the
9    vicinity of the heart; and, in fact, there was an
10   experiment which indicated that it resulted in
11   arrhythmia when the distance between the TASER
12   electrode and the heart was only a few millimeters or
13   less than one centimeter.
14        And there are people who believe that the TASER
15   can cause arrhythmia. There are other people that the
16   TASER is safer than both of us.
17   Q.  But you are not telling us you have an opinion
18   about that, are you?
19   A.  In this situation, the point of the TASER
20   electrode was to the back, to the lower back
21   (indicating) and this is a position that according to
22   the studies on the TASER did not really consider have
23   a big danger in resulting in arrhythmia. TASER

## Page 41

1 Pathology Examination"?
2 A. Where is that?
3 Q. It is the first paragraph, sir.
4 A. Oh, yes.
5 Q. What does that first paragraph mean in lay
6 terms?
7 A. She did a neurochemical, which means that
8 chemically, she examined the brain, the neuro-
9 transmitters or the brain or something like that.
10 Q. You are not familiar with what this means, I
11 guess? I am just trying to find out what she did. It
12 says she dissected something from the frozen specimen
13 for neurochemical measurement. Do you know what type
14 of neurochemical measurement she was making?
15 A. I have no idea. I think the best way is you
16 can ask her.
17 Q. I am just trying to find out what this means,
18 frankly, because I don't understand it. It says,
19 "density of binding sites." Do you know what binding
20 sites are?
21 A. The binding sites are the sites where the
22 transmitter will go and bind to the cell to result in
23 whatever action it is. That is my understanding of

## Page 42

1 it, and she is talking about the sites on the Dopamine
2 transporter, the binding sites on the Dopamine
3 transporter.
4 I am guessing like you. I don't have much idea
5 about that.
6 Q. Believe me, if you don't know, just tell me you
7 don't know, and I will go to the next question. I am
8 just trying to educate myself, because I don't have
9 any idea what most of this means. If you know, tell
10 me. If not, just tell me.
11 A. Okay.
12 Q. In the second paragraph, it says, "A
13 neurochemical analysis of the number of Dopamine
14 transporters was completed on this case. The density
15 and affinity binding parameters were assayed within
16 the ventromedial putamen" -- am I pronouncing that
17 right?
18 A. Yes.
19 Q. P-u-t-a-m-e-n -- "using a selective radioligand
20 and a validated neurochemical assay." Okay? Do you
21 know what that means?
22 A. As I indicated, it would be better to go to Dr.
23 Mash and ask her to explain that to you.

## Page 43

1 Q. So you don't know that this means?
2 A. No, I don't.
3 Q. Now she has here, "Reference specimens were
4 included in the assays for direct comparison to
5 normalized values determined for control subjects and
6 victims of agitated excited delirium." You don't
7 know?
8 A. Ask her.
9 Q. "The results demonstrated that this case," and
10 I am assuming she means the André Thomas case, "had an
11 elevated number of Dopamine transporter sites, as
12 compared to age-matched and drug-free control
13 subjects." Ask her?
14 A. (The witness nods his head.)
15 Q. You got to say "yes."
16 A. Yes.
17 Q. "The values are provided below," and it says in
18 parentheses, "Table 1 and Figure 1," and then it
19 continues, "and are compared to the reference
20 parameters determined for control subjects, chronic
21 cocaine abusers, and victims of cocaine-related
22 delirium." Ask her?
23 A. Yes.

## Page 44

1 Q. Do you know what this table means, Table 1?
2 Can you interpret that for me?
3 A. I don't have any idea.
4 Q. Is that true for the rest of the report, as
5 well?
6 A. Yes. The rest of the report, and the main
7 result that I can see from her report is that she said
8 that this is a relationship between psychiatric
9 symptoms and combined metoprolol, which is also
10 another drug, and cocaine abuse. This is suggested by
11 the known effects of metoprolol in the CNS. High
12 concentration of this metoprolol has been associated
13 with disrupted sleep-wake situation.
14 Q. I'm sorry. What page are you on?
15 A. The last page.
16 Q. The second page?
17 A. The second page. It says that, "The review of
18 the incident report for this case suggests that the
19 decedent was suffering from a drug-induced delirium
20 prior to death."
21 Q. So that is what you were interested in her
22 saying?
23 A. Yes.

## Page 45

Q. This other stuff you don't have any idea about?
A. Yes. This other stuff, she is just explaining her way of doing and her way of reaching her conclusion.
Q. Now, do you see on page 3 -- well, it is what is marked page 4, but it is page 3 of her report?
A. Yes. Yes.
Q. And it looks like some sort or a chart or a graph?
A. Yes.
Q. Can you interpret it?
A. Yes.
Q. It says, "Figure 1: Equilibrium saturation binding" -- Oh, boy.
A. -- "on membrane homogenates taken from Allegheny County." I think you get it better if you ask her.
Q. Is it fair, then, to say when you read her conclusion that this was an agitated delirium, that you accepted that conclusion from her report?
A. Yes. And in fact, if you put the whole thing together, it is a case of cocaine intoxication resulting in the agitated delirium, resulting in the

## Page 46

death. Clinically, it is like that, with her report or without her report.
Q. What actually killed him?
A. Arrhythmia.
Q. What physiological --
A. Arrhythmia, cardiac arrhythmia.
Q. How do you know that?
A. Because there is no other obvious reason for that. The mechanism in cases of cocaine intoxication and in agitated delirium and cocaine intoxication, the mechanism of death is arrhythmia.
Q. So if a person knows that an individual has a symptomatology of acute cocaine intoxication, what should they do?
MR. HAMILTON: Object to the form.
A. They should observe them. They should attempt to take care of them, try to calm them down, and all they can do is observe them.
Q. I believe you told me earlier in the deposition that the reason that you were waiting for Dr. Mash's report was to confirm the diagnosis of agitated delirium. Is that still your testimony?
A. That was a possibility.

## Page 47

Q. Is it still your testimony?
A. Yes. I mentioned that earlier in the years, we used to diagnose that as cocaine intoxication without the results of her tests. Now with these tests available, we are trying to see if this could support us more in this reasoning.
Q. Are there any studies, to your knowledge, indicating that Tasing someone in a state of excitement may exacerbate the excitement?
A. Well, I don't need the studies to do that; but that is an obvious --
Q. It would exacerbate the excitement?
A. Definitely, because they would get pain due to the Tasing, and they would get more excited.
Q. I don't have a lot more left; but earlier in the deposition, we talked about the fact that this was a pending autopsy, so your process would be to internally review the matter.
A. Yes.
Q. I know that based upon Exhibit No. 1, you talked with Dr. Williams about this?
A. Yes. Right.
Q. Do you remember talking to anybody else?

## Page 48

A. I don't remember for that, but we might have discussed it in the office with other pathologists, but I don't even remember at that time who were the pathologists; but definitely, Dr. Williams -- that final decision is done after discussion with Dr. Williams, yes.
Q. So is it fair to say, then, he is the only one you ever remember discussing this with?
A. Yes.
Q. You didn't talk to Dr. Mash about this?
A. No.
Q. How about the District Attorney?
A. No.
Q. Did you speak with the District Attorney or anybody from his office?
A. No.
Q. Now, you were not the only person who attended the autopsy, as I understand it; is that right?
A. Yes. There were technicians, there was a photographer, and there were some --
Q. The police were there, too?
A. Yes, the police were there.
Q. Who where the police that attended? Do you

## Page 53

1  (Shakir Deposition Exhibit No. 7 was
2  marked for identification.)
3  Q. I will show you Exhibit No. 7.
4  A. This is part of the hospital record from UPMC
5  Braddock Hospital.
6  Q. That is where he was taken after the police
7  incident?
8  A. Yes.
9  MR. MESSER: We may be mostly done. I
10  think if we could have one copy for her before
11  she goes.
12  (Recess taken at 2:50 p.m., and testimony
13  was resumed at 2:54 p.m. this date.)
14  Q. I will show you what is marked as your
15  Deposition Exhibit No. 5, Dr. Shakir, which is the --
16  it is the narrative?
17  A. Yes.
18  Q. Could you turn to page 4, please?
19  A. Yes.
20  Q. Would you please take time to read that?
21  A. Do you specifically want me to look at anything
22  to read in it, or are you concerned about anything in
23  it?

## Page 54

1  Q. Well, I will tell you what my concern is. What
2  my concern is is that it is one-sided. The only thing
3  on here is police information. Do you see any
4  information on page 4 of Exhibit 5 that involves
5  witnesses' account of what occurred?
6  A. You see, this is preliminary information that
7  we receive. We receive it from the person who calls
8  us.
9  Q. Sure.
10  A. We do not -- at this stage of the
11  investigation, we do not have our investigators down
12  soliciting witnesses. This is the information that
13  they receive. Whoever will call in such a situation,
14  the person that they call is the police usually to see
15  what happened, and so you see information from the
16  hospital, information from the police, and this is why
17  you get that.
18  Q. Well, were you aware at the time you issued
19  your final autopsy report and the death certificate
20  that there were several witnesses who reported that
21  Mr. Thomas had been beaten prior to his death?
22  MR. HAMILTON: Object to the form.
23  MR. MESSER: I am just asking if he is

## Page 55

1  aware.
2  MR. HAMILTON: Well, you said several
3  witnesses, and I don't think there are several
4  witnesses, but that's okay.
5  MR. MESSER: There are at least four that
6  I know of out of your reports, so I think that
7  is several.
8  Q. Were you aware of that?
9  A. No.
10  Q. If, in fact, that beating had occurred, could
11  that have contributed to Mr. Thomas' death?
12  A. I have to see what kind of beating and how it
13  happened; but the findings in my autopsy, I didn't see
14  any internal injury that could have resulted in his
15  death.
16  Q. Well, you found the hematoma on his spine --
17  A. Yes.
18  Q. -- after you opened his skin, right?
19  A. Yes.
20  Q. And that hematoma was an injury that you
21  reported in your autopsy report, was it not?
22  A. Yes.
23  Q. Now, the only way that that hematoma could have

## Page 56

1  occurred is if something had come into contact with
2  Mr. Thomas' body at that point, true?
3  A. Yes. But what I meant is I did not see any
4  contusion of the heart. I did not see any intra-
5  cerebral hemorrhage. I did not see any injury inside
6  him that explained his death.
7  Q. Explained what?
8  A. Explained the death, to be a cause of death.
9  Q. Oh, no. I am not asking you if it was a cause
10  of death. I am asking you if, in fact, he was beaten,
11  would it have contributed to his death?
12  MR. HAMILTON: Asked and answered. I
13  object.
14  A. I don't see in which way it is contributing.
15  MR. PUSHINSKY: Could it have contributed
16  to the agitation?
17  THE WITNESS: The agitation, yes. From
18  being agitated, yes.
19  Q. Would those facts have been important to you at
20  the time you issued your autopsy report?
21  MR. HAMILTON: Object to the form.
22  A. In fact, at the time, I would have liked to
23  have the knowledge about these.