IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONNA J. THOMAS, ADMINISTRATRIX OF THE ESTATE OF ANDRE THOMAS, DECEASED, ON BEHALF OF THE ESTATE OF ANDRE THOMAS, <br><br> Plaintiff <br><br> V. <br><br> BOROUGH OF SWISSVALE, DEBRA LYNN INDOVINA-AKERLY, JUSTIN LEE KEENAN and GARY DICKSON, <br><br> Defendants | Civil Action No. 09-996 <br><br> Judge Nora Barry Fischer <br><br> **JURY TRIAL DEMANDED** |

## DEPOSITION TRANSCRIPT EXCERPTS

## OF

## KARL E. WILLIAMS, M.D.

# EXHIBIT 3

# TO

**PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DEBORAH MASH, PH.D. AND ANY EVIDENCE REGARDING AN ALLEGED CONDITION REFERRED TO AS EITHER EXCITED DELIRIUM, AGITATED DELIRIUM AND/OR DRUG-INDUCED DELIRIUM**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -

DONNA J. THOMAS, Administratrix )
of the Estate of ANDRE THOMAS, )
Deceased, on behalf of the Estate )
of ANDRE THOMAS, )
          Plaintiff, )
  vs. )Civil Action
)No. 2:09-cv-996-NBF
BOROUGH OF SWISSVALE; DEBRA LYNN )
INDOVINA-AKERLEY; JUSTIN LEE, )
KEENAN; and GARY DICKSON, )
)
          Defendants. )

- - -

DEPOSITION OF KARL E. WILLIAMS, M.D.

THURSDAY, AUGUST 4, 2011

- - -

    DEPOSITION OF KARL E. WILLIAMS, M.D. called as a witness by the Plaintiff, taken pursuant to Notice of Deposition and the Federal Rules of Civil Procedure, by and before Ronda J. Weinell, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the Office of the Medical Examiner of Allegheny County, 1119 Penn Avenue, Pittsburgh, Pennsylvania, commencing at 1:54 p.m. on the day and date above set forth.

- - -

**9**

1  pathology.
2  Q. Now, it is fair to say that you have not
3  investigated or written any articles, peer-reviewed or
4  otherwise, dealing with the issue of what we can call
5  excited delirium?
6  A. I gave one presentation up in Western
7  Psychiatric Institute in 2008 about a case that I
8  performed as an autopsy here that was an unusual case.
9  I used that case to present to them an overview of
10 excited delirium.
11 Q. What is excited delirium?
12 A. Excited delirium does not have a specific
13 medical diagnosis that everyone agrees on, so it's
14 hard to say exactly what it is.
15 Q. Now, yesterday we talked with Dr. Mash.
16 A. Correct.
17 Q. That you referred certain frozen specimens, I
18 believe, of Andre Thomas's brain to her.
19 A. That's correct.
20 Q. For examination.
21 A. That's correct.
22 Q. She told us that the largest study that she was
23 familiar with — and it may not be a study. It may be

**10**

1  actually a collection of information — was a group of
2  90 individuals, and it was published in the medical
3  literature. Do you have any current recollection of
4  being familiar with reading that study or reading that
5  article?
6  A. I have no idea exactly what study you're
7  talking about. There's been a lot of studies written
8  about excited delirium.
9  Q. She told us yesterday that, essentially, more
10 than 90 percent of all of the excited delirium cases
11 she was associated with were in-custody, police death
12 situations. Is that your understanding, as well?
13 A. 90 percent sounds high. We've had cases in
14 this office where we find people dead at home in their
15 environment and believe that there was a case of
16 excited delirium independent of any involvement with
17 the police.
18     Certainly, since the excitation, the excited
19 state of the person often happens in public, a large
20 percentage of those wind up coming to the attention of
21 the police. I wouldn't say 90 percent.
22 Q. Here's the main problem with your definition
23 you just gave, and from what she told us, the only way

**11**

1  you can diagnose excited delirium is based upon the
2  witness to the event of the excitement telling you
3  what the person was doing.
4  A. I don't agree with that.
5     MR. HAMILTON: I'm going to object to the
6  form of that question, too.
7     MR. MESSER: Subject to verification.
8  Q. You don't agree with that?
9  A. Well, if we don't have — I mean, Dr. Mash
10 feels that she has a very specific diagnosis, because
11 she bases it on getting frozen sections of the brain.
12 Well, if you find somebody dead in an apartment,
13 you're not going to send the brain to Dr. Mash.
14     The case that I had at Western Psych occurred
15 without any police involvement, but with issues that
16 were the same thing because of the caregivers at
17 Western Psych. Clear case of excited delirium, but
18 not involved with police, but in this case involving
19 an eyewitness. It's all over the place.
20     If I don't have a definition of excited
21 delirium and there is no uniform definition of excited
22 delirium, how can you say 90 percent is this, 80
23 percent is this, 70 percent is this?

**12**

1  Q. I understand. It's a whole big, fat moving
2  target as far as medicine is concerned.
3     MR. HAMILTON: Object to form.
4  Q. Is that true?
5  A. It has not been characterized in a way that the
6  scientific community agrees on the definition. Let me
7  say that.
8  Q. It is true that the American Medical
9  Association has not accepted excited delirium, any
10 definition of it? True?
11 A. I don't know that one way or the other.
12 Q. Are you aware that the Royal Canadian Mounted
13 Police did a study of excited delirium and rejects it
14 as a diagnosis, as a syndrome, or as a disease?
15 A. I was not aware of that. Is that in their
16 TASER task force, or is that specifically their
17 excited delirium —
18 Q. Excited delirium, separate task force.
19 A. I don't know of that report.
20 Q. Are you aware, sir, of any other groups that
21 have either published or written journal articles
22 critical of the, quote, "excited delirium," end quote,
23 issue?

**Page 13**

1  A. I am sure that there are.
2  Q. Is it my understanding of what you just
3  testified to that there may be certain psychiatric
4  issues like mania, delirium, and otherwise that fall
5  within what you might consider to be excited delirium?
6  A. It's an interesting entity, and the DiMaio
7  book, which you must be aware of, has most of the
8  information, if that's still current. There were
9  cases of agitated delirium of a very chronic nature
10 before the advent of psychotropic medications. People
11 would die of what is called Bell's mania. It was
12 called a lot of different things; okay?
13     And with the advent of Thorazine and the
14 psychotropics in the fifties, those cases kind of died
15 out. Now we're seeing what DiMaio says is a different
16 manifestation of the same syndrome currently. So the
17 entity may have a very long medical history associated
18 with it.
19 Q. If it is an entity?
20 A. I believe it's an entity.
21 Q. A lot of people don't.
22 A. I don't know how many do or don't. It is one
23 of the most controversial areas in forensic pathology,

**Page 14**

1  for sure.
2  Q. Why is it only confined to men?
3  A. I don't know that it is.
4  Q. Well, the expert yesterday said that over 90
5  percent of the victims of excited delirium are men.
6  A. I would not characterize Dr. Mash as an expert
7  in excited delirium. She is not a physician, to begin
8  with, and she's got a very unique population group,
9  which is out of Miami. All of her studies are out of
10 Miami and largely associated with the cocaine using
11 group in Miami. So I don't know that she is an expert
12 in excited delirium.
13     I think that her study is very interesting. I
14 think that you can take information from that. But I
15 don't know that she's necessarily the expert in
16 excited delirium.
17 Q. Well, what she essentially told us was that —
18 and these are subject to verification — what I
19 believe she told us was that over 90 percent of the
20 victims of excited delirium in her purview were male,
21 and of those 90 percent, over 90 percent were African
22 American male.
23     So my question is has it been your experience

**Page 15**

1  here in connection with Mr. Thomas's case that the
2  same information is true, that most of them are
3  African American men that have been diagnosed as being
4  dead as a result of excited delirium?
5         MR. HAMILTON: Object to the form.
6  Q. I mean do you understand?
7  A. I understand exactly what you're saying. My
8  numbers are significantly smaller. Again, Dr. Mash is
9  dealing with Miami, with a completely different
10 demographic population in Miami.
11     I've looked at the cases coming through here,
12 including a couple right before I became medical
13 examiner, and we're only talking about a half a dozen
14 or eight cases or so. But probably half of those are
15 white, are Caucasian, and although you raise an
16 interesting point about males, because I don't know
17 that I've seen a female case, and I don't know the
18 literature.
19 Q. Well, what she was referring to down there was
20 the abstracts that she had gathered from all over the
21 country. This wasn't just — but, anyway, let's move
22 along.
23     At some point in time, you became involved with

**Page 16**

1  the investigation, I believe, and the subsequent
2  autopsy and report regarding Mr. Thomas, Andre Thomas?
3  A. Yes.
4  Q. Is that true? And somebody made a decision in
5  the office to send frozen brain samples, I think, as
6  she identified to Dr. Mash.
7  A. That's correct.
8  Q. Who did that?
9  A. It was probably a joint decision of Dr. Shakir
10 and mine. We both were aware that the test had been
11 used previously in this office a couple of times, so
12 we knew it was available, and in a case of this
13 nature, probably decided to see if it would add any
14 additional information.
15 Q. And they were sent?
16 A. Correct.
17 Q. And then she prepared a report that was
18 ultimately sent back to you, I believe?
19 A. That's correct.
20 Q. I'm not sure how much — may I look at that?
21 A. Sure. It's in there. It's the last part of
22 it.
23 Q. By the way, one question I keep asking people,

**21**

1 decision then to send these studies to Dr. Miller —
2     MR. PUSHINSKY: Mash.
3 Q. I'm sorry. Dr. Mash to perform an analysis?
4 A. Correct.
5 Q. All right. And that analysis, I believe you
6 have one of your original copies.
7     MR. MESSER: Could you mark this Exhibit
8     No. 2, please.
9     (Deposition Exhibit No. 2 was marked for
10 identification.)
11 Q. Do you have your copy in front of you, sir?
12 A. I do, yes.
13 Q. Now, in this report she goes through a whole
14 statistical computation of things she explained to me
15 yesterday, and I still don't understand. Did you
16 understand what she has done here statistically in the
17 creation of this report?
18 A. My interpretation of this, especially after
19 talking to her, is that she believes that she can, by
20 an analysis of the high-affinity and low-affinity
21 cocaine binding sites in the particular area of the
22 brain, she believes that she can tell the difference
23 between a case of pure excited delirium, if you will,

**22**

1 or excited delirium, as opposed to those cases where
2 the cause is more delirium and an agitation caused by
3 cocaine rather than — and, again they're all
4 precipitated by cocaine. They're all in chronic users
5 of cocaine. So it's a very subtle kind of analysis.
6     That was one of the reasons we decided to send
7 it to her, just to be able to have some additional
8 idea in our mind — okay — about what — because
9 there are no tests for excited delirium. I'm not sure
10 hers — remember, she's the only one that's doing
11 this.
12     So I know it appears in peer-reviewed
13 literature, but her test is not necessarily
14 universally accepted as a proof of excited delirium,
15 either. Okay? So —
16 Q. Well, you don't accept it as a proof, do you?
17 A. I take her test as I take any other laboratory
18 test, as another piece of information that I use to
19 feed into the whole puzzle of the final wording of a
20 death statement.
21     So there are very few individual tests — you
22 know, if I've got a glucose of 550, I know what I'm
23 dealing with. Measuring high- and low-affinity

**23**

1 cocaine receptors in the putamen when she's the only
2 one that's doing it, I'm not fully sure about it, what
3 to do with that, and I haven't had time to review the
4 literature to see if there are people that criticize
5 it statistically, criticize it, many other viewpoints.
6 Q. I understand. What I understand what you're
7 saying is if you get a blood analysis back, it's
8 reliable. I mean, if they say there's a certain
9 percentage of alcohol in the blood, you would rely
10 upon that report. But whenever you consider a report
11 such as this one from Dr. Mash, you consider it, but
12 you have your own independent ability to make
13 determinations about whether or not you're going to
14 accept all of it, part of it, or some of it. Is that
15 fair?
16 A. That's fair.
17     MR. HAMILTON: Object to the form.
18 Q. Now, in this report she talks about we have
19 demonstrated a marked increase in HSP1AB.
20 A. Right.
21 Q. Do you know what that is?
22 A. A heat-related protein of some sort in the
23 brain.

**24**

1 Q. Right. Now, do you know what part that plays
2 in the analysis of excited delirium?
3 A. One of the — and it's more particularly noted
4 in Miami with her studies, maybe because it's hotter
5 in Miami. I'm not sure. But one of the clinical
6 correlates of excited delirium can be hyperthermia,
7 increased body temperature, even leading to the
8 breakdown of muscle and rapid myolysis, which she
9 probably mentioned, also.
10     So it's like anything else in an event of this
11 nature, what you have, what don't you have, what is
12 the clinical history, is here cocaine there, what else
13 is there.
14     These are extraordinarily complex cases to sort
15 out.
16 Q. What faith do you have in the HSP1AB analysis?
17 A. I've never heard it used in any other case
18 other than her using it in cases of excited delirium.
19 So I don't know what else it might be used with in the
20 scientific literature and what else it might indicate.
21 Q. But this is the only way you've heard it used
22 here, in excited delirium?
23 A. I have to say I haven't come across any other

**25**

1  area of forensic pathology where it's of any utility
2  so that I've thought of using it. I presume, like any
3  other substance, it's well researched, well validated,
4  and animal studies have been done. I'm sure that it's
5  real. I just don't know its significance other than
6  Dr. Mash saying that it's got a twofold increase. It
7  doesn't help me any more than the clinical picture,
8  the finding of the cocaine or anything else.
9      Q.  She also indicates that the metoprolol --
10 that's M-E-T-O-P-R-O-L-O-L --
11     A.  Metoprolol.
12     Q.  Right.
13     A.  Yes, she was fascinated by that when I talked
14 to her. And I think her thinking has probably
15 progressed, since this is 2008. I'm sure she's got
16 more information on that. I was interested in it,
17 because as I said, I had a 20-year-old head injured
18 Caucasian male at Western Psych that also had
19 psychotropic medications but not cocaine and things
20 that had a full blown appearance of what I would call
21 agitated delirium.
22         The brain studies were not done. Probably did
23 not have all of the pattern of cocaine receptors and

**26**

1  things. Okay?
2         So it's well known that it can occur with other
3  medications than cocaine. Certainly, it can occur
4  with other amphetamine-like medications, PCP or other
5  drugs that are analogs that act the same way as
6  cocaine, but also other drugs that have a completely
7  different method of action.
8      Q.  Why don't you tell me what you remember about
9  your conversation with Dr. Mash, and tell us when it
10 occurred.
11     A.  That's about all I remember. I've said it. It
12 was 2008. It was specific to this report. And I'm
13 left only with a couple of impressions. One is that
14 she felt it was not clear that the studies at that
15 time proved the entity of excited delirium, whatever
16 her criteria for that was, but she felt more that it
17 was, as we said, an agitated delirium due to the
18 cocaine in obviously a user that has evidence of prior
19 cocaine use, another part of her report, and had a
20 clinical history of a previous similar event some
21 months before; and also that she was curious about the
22 presence of the metoprolol as something that might
23 have interacted with the cocaine that might have been

**27**

1  another contributor to the timing of the event.
2      Q.  So what I understand basically from what you're
3  saying is that she differentiated between excited
4  delirium and agitated delirium and said that this was
5  a case of agitated delirium versus excited delirium;
6  true?
7      A.  I don't know that she used the words agitated
8  delirium as opposed to what she says, perhaps, in her
9  report. Doesn't she say cocaine associated --
10     Q.  She says drug-induced delirium.
11     A.  Drug-induced delirium, cocaine-related. She
12 uses the phrase cocaine-related delirium. See down in
13 her --
14     Q.  Where are you pointing, sir?
15     A.  I'm looking down in her table. She's got
16 categories of excited delirium and categories of
17 cocaine overdose. Although in her narrative, she
18 refers to cocaine-related delirium.
19         So as I'm noticing it now, there is a little
20 bit of a discrepancy between her narrative -- okay --
21 well it's not explicit in there that she's making that
22 differentiation. She is not a doctor, so she doesn't
23 give us a diagnosis. So she may read her report with

**28**

1  a different meaning in it from the interpretation I
2  took from speaking with her. So she's not really
3  completely explicit in this report.
4         If she reviewed it now three years later, she
5  might have a different feeling about it. "The review
6  of the incident report suggests that the decedent was
7  suffering from a drug-induced delirium prior to
8  death." And that's all she really commits to in that
9  specifically.
10        So she does not, in her report, claim to be
11 able to tell in this particular case that it is an
12 excited delirium. Again, in her table she says
13 excited delirium, and there's values for excited
14 delirium. And I don't know what her definition is for
15 those 60 cases of excited delirium from looking at
16 this.
17     Q.  Right.
18     A.  And none of her references seem -- the fourth
19 paper in here references -- the fifth with Wetli and
20 her name on it is the principal paper from 1996, is
21 one of her earlier studies in that. And I don't know
22 whether -- I don't know whether she and Dr. Wetli
23 define excited delirium specifically in that. So

**29**

1  there's some holes in here.
2      Q.  Holes?
3      A.  Well, in the lack of specificity of the report
4  itself to try to figure out what she's saying. If you
5  look at the last column of this Table 1, and you see
6  the top number of 206.1 for our case —
7      Q.  Yes, sir.
8      A.  — and you see the control and you see excited
9  delirium. Okay? And then you look down at the bottom
10 for cocaine overdose, you'll see that the number is
11 right in that range. If you look over — so showing
12 out of the range for what she defines in that last
13 column for excited delirium, but in the range that she
14 defines for cocaine overdose, almost right in the
15 middle, almost exactly.
16         If we go down for the high-affinity cocaine
17 site, which is the second column, with the Allegheny
18 County Medical Examiner at 48, excited delirium then
19 is 7.8, and cocaine overdose is 47.3. My
20 interpretation of that is that those numbers suggest
21 that this is a cocaine overdose.
22     Q.  And not excited delirium?
23     A.  And not excited delirium.

**30**

1      MR. MESSER:  That's all of the questions I
2  have.
3      MR. HAMILTON:  Let me just ask a question.
4           CROSS-EXAMINATION
5  BY MR. HAMILTON:
6      Q.  The August 5, 2008, report is signed by you and
7  Dr. Shakir?
8      A.  Correct.
9      Q.  Can you tell us how this works. Did he do the
10 actual physical autopsy? Did you participate in it
11 with him? Can you tell us, to the extent you have
12 independent recollection or these documents help you,
13 how this works. You signed that report.
14     A.  I countersign every report that goes out of the
15 office, so that's the easy part in that. I have a
16 recollection of being in the autopsy room for this, as
17 I almost all was, and if it's a case that appears to
18 be something that's going to be of specific interest.
19        I actually go in the autopsy room almost every
20 day that I'm here just to look for those cases. In a
21 case of death in custody as this is, I'll always try
22 to be there, just to know that I've seen the findings
23 in the case.

**31**

1      Q.  Now, whether you were actually there or how
2  much time you were in the room where the autopsy was
3  conducted or not, do you, as a matter of course, or
4  did you, as a matter of course with Dr. Shakir,
5  discuss the anatomic diagnoses that are listed above
6  before both of your signatures were affixed to the
7  report?
8      A.  I don't in all cases. In this case I certainly
9  do remember having discussions about it with him.
10     Q.  So to the extent that there are opinions
11 expressed in the autopsy report from the medical
12 examiner in the case of Andre Thomas, they're opinions
13 of yours and Dr. Shakir's?
14     A.  Yes.
15     Q.  And some of those opinions are listed on the
16 August 5 report, the bottom of which has your
17 signature; correct?
18     A.  That's correct.
19     Q.  Cause of death?
20     A.  A cocaine intoxication, agitated delirium as
21 the clinical manifestations of a cocaine intoxication.
22     Q.  And can you explain what that means. I mean —
23     A.  Well, as I said, cocaine is an extremely toxic

**32**

1  drug, can result in sudden cardiac death due to
2  arrhythmias, due to bleeding, due to increased blood
3  pressure. And we know that it can, as many drugs can,
4  lead to a psychiatric state manifested by extreme
5  delirium. That, in and of itself, can kill you.
6         As a case, like I say, where someone was found
7  in an apartment, closed apartment, the apartment
8  completely disorganized, trashed, as if it had
9  occurred in a state of agitation, him dead and finding
10 cocaine in his body, so do I need to witness that to
11 know that that's a case of agitation due to cocaine?
12 No. I don't feel that I really do.
13        It's a known manifestation of cocaine. Most of
14 the cases, whether you call it excited or agitated
15 delirium, are associated specifically with cocaine or
16 other amphetamine-like drugs and then a smaller
17 percentage to the other drugs. It's just a
18 well-documented association, clinical manifestation in
19 a certain number of cases of cocaine.
20     Q.  And if I heard you correctly, none of the
21 actual physical findings, external and internal
22 examination, this portion of the autopsy, not the lab
23 reports —