IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONNA J. THOMAS, Administratrix of the Estate of ANDRE THOMAS, Deceased, on behalf of the Estate of ANDRE THOMAS </br></br>Plaintiff, </br></br>v. </br></br>BOROUGH OF SWISSVALE; DEBRA LYNN INDOVINA-AKERLY; JUSTIN LEE KEENAN; and GARY DICKSON </br></br>Defendants. | CASE NO:  2:09-cv-00996-NBF </br></br></br></br>JURY TRIAL DEMANDED |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY AND EVIDENCE REGARDING EXCITED DELIRIUM, AGITATED DELIRIUM AND/OR DRUG-INDUCED DELIRIUM

AND NOW come the Defendants, Borough of Swissvale, Debra Lynn Indovina-Akerley, Justin Lee Keenan, and Gary Dickson by and through their attorneys, Mark R. Hamilton and Cipriani & Werner, P.C., and file the within Brief in Opposition to Plaintiff's Motion to Exclude Expert Testimony and Evidence Regarding Excited Delirium, Agitated Delirium and/or Drug-Induced Delirium (Doc. No. 42).

**I.     Introduction**

By her Motion pursuant to Federal Rule of Evidence 702 and the Supreme Court's standard pronounced in *Daubert*, Plaintiff seeks to exclude the testimony of Deborah Mash, Ph.D., from testifying as an expert at trial. Plaintiff also seeks to exclude any evidence that Plaintiff's decedent, Andre Thomas ("Thomas") suffered from excited or agitated delirium ("ExD" or "ExDS") or drug-induced delirium and that those conditions had a role in Thomas' death.  Plaintiff's Motion must be denied for several

1

reasons.[1] First, Dr. Mash has not been retained or proffered by Defendants as an expert witness under Federal Rule of Civil Procedure 26(a)(2)(B). At the request and expense of Plaintiff's counsel, she was deposed regarding her consultative work requested by the Allegheny County Medical Examiner's Office in relation to Thomas' death, performed prior to the commencement of this litigation. Second, the Medical Examiner made an independent diagnosis as to Thomas' cause of death based upon Drs. Shakir and Williams' own observations and findings, in conjunction with Dr. Mash's report. Third, Plaintiff's contention that ExD does not exist is belied by current medical literature discussing that, while the exact terminology has yet to be formally accepted, ExD is recognized as a real syndrome.

## II.   Dr. Mash's Background

Dr. Deborah C. Mash is a professor of neurology at the University of Miami, Miller School of Medicine, Department of Neurology. Her primary academic appointment is Neurology; she holds secondary appointments in the Department of Molecular and Cellular Pharmacology. Although she is not a medical doctor, she completed a post-doctoral fellowship study in neurology and neuro-anatomy at the Harvard School of Medicine. Dr. Mash has a Master's Degree in pharmacology and toxicology, and a Ph.D. in neuropharmacology. (Exhibit A, Deposition Transcript of Dr. Mash at p. 5-6). The research of Dr. Mash includes the analysis of the neurochemical pathology of the brain; and, specifically, brain biomarker studies in a laboratory setting.

---

[1] Defendants object to Plaintiff's characterization that Thomas died "at the hands of Swissvale Borough police officers" and note that Plaintiff does not provide any record citation in support of such an assertion. (Doc. No. 42 at ¶ 1). Defendants further object to the characterization that Thomas had not been accused of committing any crime at the time of his arrest and that "[s]everal eye witnesses report that he was brutally beaten by Defendants Keenan and Dickson." (Doc. No. 43 at p. 1). Again, Plaintiff does not point to any facts of record that would support such facts.

She serves as a consultant to medical examiners, physicians, and toxicologists in the United States, Canada, and Europe. (*Id.* at p. 12, 14). She has been a National Institute of Health funded researcher for two decades in the study of the mechanisms of cocaine-related sudden death (*Id.* at p. 9). Since the 1980s, she has been involved in the study of the human brain and behavior. (*Id.*).

Dr. Mash is the director and founder of the University of Miami Brian Endowment Bank – one of the largest postmortem collections of human brains. (*Id.* at p. 8). This background lays the foundation for her study and work towards a diagnostic test for identifying ExD as a neurological or psychiatric disorder. With regard to her NIH grant funding, 40% of it is directed to studying ExD. (*Id.* at p. 36). She has been consulted approximately twenty to thirty times on the topic of ExD. (*Id.* at p. 75). Since 2008, Dr. Mash has reviewed 110 cases of ExD; where she has been called as a consultant, she has reviewed about 150 cases. (*Id.* at p. 78-79).

### III.  Allegheny County Medical Examiner's Referral to Dr. Mash

Because there was no single physical finding that was sufficient to result in the death of Andre Thomas, Allegheny County Medical Examiner, Karl Williams, M.D. determined that it was necessary to evaluate certain laboratory tests and findings, including the findings of Dr. Mash's test. (Exhibit B, Deposition Transcript of Dr. Abdulrezak Shakir at p. 18, 33). The decision to send brain samples to Dr. Mash was a joint decision of Dr. Williams and Abdulrezak Shakir, M.D., a deputy medical examiner. (Exhibit C, Deposition Transcript of Dr. Karl Williams at p. 16).

Dr. Williams was aware of Dr. Mash and the testing available because he had previously used her as a consultant on other complex matters. Dr. Williams gathered as

much information as possible to determine the cause of death. (*Id.*).  Dr. Mash did not charge the Allegheny County Medical Examiner for her consultative work in this matter.

Dr. Mash received the frozen brain tissue from Drs. Shakir and Williams on August 12, 2008 (Exhibit A at p. 39-40). She evaluated the medical chart provided by the medical examiner and other additional information received, including information gathered during telephone conversations with Dr. Williams, and narrative records regarding pertinent pre-mortem information. (*Id.* at p. 41-42, 45-48). Dr. Mash conducted biomarker studies and issued a report on her neurochemical pathology examination, which became a part of the Report of Autopsy issued by the Allegheny County Office of Medical Examiner for case number 08C0R04828 (Andre Thomas) which listed "Agitated Delirium Due to Acute Cocaine Intoxication" as an anatomic diagnosis. (Exhibit C at p. 9-10).

Dr. Mash concluded that Thomas was suffering from "drug-induced delirium," a potential mechanism to support a cause of death; the wording of her report to Dr. Williams did not indicate agitated or excited delirium, although the terms are used interchangeably. (Exhibit D, Dr. Mash's Report to the Allegheny County Medical Examiner). It was her finding that Thomas suffered from a drug-induced delirium due to an interaction between cocaine and metroprolol, a drug used to control blood pressure. (Exhibit A at p. 52, 55, 124). Metroprolol can elevate dopamine in the brain, which is linked to delirium. (*Id.* at p. 125). Dr. Mash relayed to the Medical Examiner that Thomas' state of delirium could have been a combination of the two substances, a "one-two punch," leading to the exacerbation of dopamine triggering delirium. (*Id.*).

After receiving and discussing Dr. Mash's findings, and after a review of all other pathological findings and toxicology results, Drs. Shakir and Williams made the final determination as to a cause of death for Thomas; both agreed that the cause of death was "agitated delirium due to acute cocaine intoxication." (Exhibit C at p. 11-12, 24-25; *see also* Exhibit G to Defendants' Brief in Support of their Motion to Exclude the Expert Report and Medical Testimony of Dr. Cyril Wecht).

## IV. Dr. Mash is Not an Expert Witness Under Rule 26 or Rule of Evidence 702

Plaintiff has moved to exclude the testimony of Dr. Mash under Rule 702 and the standard for expert opinion testimony pronounced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As the Court is aware in light of the parties' dispute over the production of certain information from Dr. Mash (Doc. Nos. 49, 51, and 52), Dr. Mash, and Drs. Williams and Shakir for that matter, have not been "retained or specially employed" by defense counsel "to provide expert testimony in the case" under Federal Rule of Evidence 702. *See* Fed. R. Civ. P. 26(a)(2)(B).)

Drs. Mash's observations and findings are akin to treating physicians, unlike specially retained experts, and they did not provide written reports because they were not employed to testify in this case. *See* FED. R. CIV. P. 26(a)(2)(B), Advisory committee's note; *see also Diveglia v. Northwestern Mut. Life Ins. Co.*, 2004 U.S. Dist. LEXIS 30807, *8-9 (M.D. Pa. June 17, 2004). Defense counsel has never paid a fee to Mash for a report or testimony. Dr. Mash did not prepare an expert causation report for the defense and did not testify as a causation expert. She testified that she does not know who the defense experts are and did not read of the defense materials in preparation for her report to the Medical Examiner or her deposition noticed by Plaintiff. (Exhibit A at p. 94). In fact, Dr.

5

Mash was consulted by the Medical Examiner's office *before* a lawsuit was even filed in this case. Dr. Mash did not testify that Thomas' death was actually caused by ExDS; rather, she testified that Thomas suffered from a drug-induced delirium due to an interaction between cocaine and metroprolol, a drug used to control blood pressure. (Exhibit A at p. 52, 55, 124). Her status as a witness is comparable to that of an individual who performs laboratory testing in a hospital setting at the request of an attending physician. As a result, her testimony is governed by Federal Rule of Evidence 701. *See Frederick v. Hanna*, 2007 U.S. Dist. LEXIS 18626, 2007 WL 853480, *5-6 (W.D. Pa. Mar. 16, 2007)**(**treating physicians may testify as fact witnesses regarding things "within their knowledge," such as "their treatment, examination, and diagnosis of" the plaintiff, as opposed to offering expert opinion,); *see also Bynum v. MVM, Inc.*, 241 F.R.D. 52, 54 (D.D.C. Mar. 20, 2007)(a treating physician may testify as a fact witness "solely [regarding] information learned from his actual treatment, examination, or analysis of" plaintiff, but not regarding plaintiff's "current condition, prognosis, causation or permanency, any other such forward-looking speculation," "conclusion[s] reached with the benefit of hindsight," and/or opinions formed "after the underlying events that gave rise to [the] lawsuit")); *Allen v. Parkland Sch. Dist*, 230 F.App'x, 189, 194-195 (3d Cir. 2007)(not-precedential)

    Rule 701 provides that a non-expert witness may nonetheless testify to an opinion, provided that the opinion is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. To the extent that Drs. Mash, Shakir and Williams will testify concerning their observations and diagnosis, as well as opinions rendered at the time of treatment, i.e. at the time of the

autopsy, their testimony is not subject to Rule 702 or *Daubert*. *See Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 & n.1 (3d Cir. 1996); and *Bucher v. Gainey Transp. Serv.*, 167 F.R.D. 387, 390 (M.D. Pa. 1996; *see also Maynard v. Sugarloaf Twp.*, 2011 U.S. Dist. LEXIS 54679, at *14-15 (M.D. Pa. May 23, 2011); *Calhoun v. Klingensmith Healthcare, Inc.*, 2007 U.S. Dist. LEXIS 87184, at* 3-5 (W.D. Pa. Nov. 27, 2007)(treating physicians can testify without submitting expert reports when testifying about a patient's treatment and diagnosis); *Mracek v. Bryn Mawr Hosp.*, 610 F. Supp. 2d 401, 406 (E.D. Pa. 2009) ("It is agreed that treating physicians are not required to submit expert reports when testifying based on their examination, diagnosis and treatment of a patient.").

The record does not support Plaintiff's characterization of Dr. Mash as a retained expert. Dr. Mash must be allowed to testify as a lay witness in light of her testimony about her observations based on personal knowledge. *See Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999)(a treating physician is not considered an expert witness if he or she testifies regarding personal knowledge based on their own observations.). Further, she must be permitted to offer lay testimony, including "expert" facts in order to explain her testimony. *Id.* (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.08 (2d ed. 1999)).

**V.     Excited Delirium ("ExD") Has Been Medically Recognized In Substance**

Plaintiff have moved to exclude any testimony from Drs. Mash, Shakir and Williams that Thomas' death was attributed to agitated or drug-induced delirium on the basis that it is not an accepted diagnosis and there is no definition of it generally accepted by the scientific community. (Doc. No. 43 at 3). Plaintiff further argues that Dr. Mash's

7

methodology does not satisfy *Daubert*'s admissibility standards because her samples were too small and her tests are "emerging science." (*Id*. at 3-4, 9-10).

Although not a validated diagnostic entity, ExDS is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state. "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. (*See* Exhibit E).[2] The signs and symptoms typically ascribed to the condition include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals. (*See also* Carolyn B. Robinowitz, M.D., Report of the Counsel on Science and Public Health 453 (AMA, Annual Meeting 2009)).

The White Paper Report on ExD Syndrome referenced in Plaintiff's Brief was based on a task force panel and the authorship of eighteen (18) licensed medical doctors and one, non-medically licensed medical professional, Dr. Mash. (*See* Exhibit F, ACEP's White Paper Report on Excited Delirium Syndrome).[3] The panel of emergency physicians and a researcher, Dr. Mash, were referenced as experts in ExDS. (*Id.* at p. 4). This report notes that it is the consensus of the task force that ExDS "is a unique

---

[2]This is an independent article co-authored by Dr. Mash with several other physicians and medical examiners.

[3]The White Paper has been subject to peer review and approval, and was published in *The Journal of Emergency Medicine* in 2011.

syndrome which may be identified by the presence of a distinctive group of clinical and behavioral characteristics that can be recognized in the pre-mortem state." (*Id.*). The panel acknowledged the controversy surrounding this condition in conjunction with the issue that medical personnel do not have a definitive diagnostic test for ExDS given its lack of a well-defined, consistent epidemiological case definition and overlap with other established diseases; therefore, it must be identified through its clinical features. (*Id.* at p. 5-6, 17). In recognizing that some believe it to be "manufactured" as a "conspiracy or cover-up for brutality," the panel wrote:

> This argument mainly centers on the fact that most organized medical associations (e.g., American Medical Association) and medical coding reference materials (e.g., International Classification of Diseases, Ninth Revision, or ICD-9) do not recognize the exact term "excited delirium" or "excited delirium syndrome." The countering argument is that there are organized medical associations that do recognize ExDS as an entity (e.g., National Association of Medical Examiners) and reference such as ICD-9 contain several codes that can be used to describe the same entity as ExDS, albeit with different wording.
> …
> The issue of semantics does not indicate that ExDS does not exist, but it does mean that this exact and specific terminology may not yet be accepted within some organizations or references.

(Exhibit F, at p. 6). It was the consensus of the task force and the Board of Directors that commissioned the White Paper that ExDS is a real syndrome of uncertain etiology recognized by the forensic community, emergency room physicians and medical examiners.[4] (*Id.* at p. 18). "It is characterized by delirium, agitation, and hyperadrenergic

---

[4]*See also* Stratton, S., M.D., et al., *Factors Associated with Sudden Death of Individuals Requiring Restraint for Excited Delirium,* Am. J. Emerg. Med. 2001; 19:187-191; Laur, Darren, *Excited Delirium and Its Correlation to Sudden Death and Unexpected Death Proximal to Restraint,* Canadian Police Research Centre, 2005; Samuel, Edith, et al., *Excited Delirium: Consideration of selected medical and psychiatric*

autonomic dysfunction, typically in the setting of acute on chronic drug abuse or serious mental illness." (*Id.*). The White Paper notes that ExDS is recognized in the ICD-9 classification, as well as the DSM-IV, and provides classification codes that emergency physicians use to describe the condition if presented in an emergency room. (Exhibit A at p. 116). The forensic community has recognized it as a medical state. (*Id.* at p. 117-118).

In light of the medical community's finding that ExD is a recognized syndrome, Plaintiff's contention that ExDS has not been scientifically established is wholly inaccurate. (*See* Doc. No. 43 at p. 7). Plaintiff's reliance on Dr. Wecht for such a proposition is without merit as Dr. Wecht testified that he has not conducted any research or test of his own on the topic, nor has he kept apprised of the recent medical literature discussing the condition as a real syndrome. (Exhibit K, Deposition of Dr. Cyril Wecht at p. 40-43). To the contrary, Dr. Wecht testified that from a pathophysiological standpoint, the symptoms associated with ExD are recognized. (*Id.* 43). Furthermore, while ExDS may not yet be recognized by the American Medical Association or the American Psychiatric Association, it has been acknowledged as an existing syndrome by the American College of Emergency Physicians, the American Society of Forensic Pathologists, and the National Association of Medical Examiners. (*See* Exhibit F).

For the foregoing reasons, Defendants respectfully request that the Court reject Plaintiff's argument that ExDS is not an accepted medical diagnosis.

## VI. Dr. Mash's Methodology

---

*issues*, Neuropsychiatric Disease and Treatment 2009: 5:61-66; Vilke, S, M.D., et al., *Excited Delirium Syndrome (EXDS): Defining Based on a Review of the Literature*, The Journal of Emergency Medicine 2011. (Attached as Exhibits G, H, I and J, respectively)(recognizing ExD a syndrome, or group of symptoms).

Notwithstanding that Dr. Mash is not a witness subject to the scrutiny of Rule 702 and *Daubert*, Defendants will address Plaintiff's arguments that her methodology is unreliable. Plaintiff takes issue with Dr. Mash's study because it was only based on 90 individuals and makes the leap that her protocols are not accepted in the field as diagnostic tools or medicine. She requests that any evidence referencing Dr. Mash's study and report be excluded.

The Court of Appeals for the Third Circuit has set forth the lens through which to view reliability:

> The reliability requirement … should not be applied too strictly. Helpfulness to the trier of fact remains the ultimate touchstone of admissibility. If the expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently reliable. A determination that the expert has good grounds assures that the expert's opinions are based on science rather than 'subjective belief or unsupported speculation.'

*Holbrook v. Lykes Bros. Steamship Co, Inc.*, 80 F.3d 777, 780-81, 784 (3d Cir. 1996)(citing to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993)). Admissibility depends in part upon "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994). This standard is not intended to be a high one, nor is it to be applied in a manner that requires a party "to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744. Its principle is not dissimilar to the Federal Rules' general provision that, unless otherwise specified "all

relevant evidence is admissible" and "evidence which is not relevant is not admissible." FED. R. EVID. 402; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)(interpreting Rule 702 as requiring all expert testimony to be relevant and reliable).

The methodology used by Dr. Mash, while not yet accepted as a diagnostic tool, is an accepted protocol and used routinely in medicine and forensics. (Exhibit A at p. 27-29). Dr. Mash utilized a semi-quantitative method to test the Thomas' brain tissue samples in 2008, prior to her work on The White Paper in 2009. (*Id.* at p. 24-25). One of the goals of the The White Paper was to move towards establishing a standard practice for labs to analyze brain biomarkers. (*Id.*). After further improvements to her study protocols and laboratory equipment as a result of the findings of the The White Paper task force, Dr. Mash was able to move to a more quantitative test. (*Id.* at p. 25). In 2009, after Dr. Mash issued her report at issue in this case, she conducted a second, quantitative test on the tissue sample she received from Dr. Williams, with a more advanced and sensitive testing procedure. The results were consistent with her original conclusion of drug-induced delirium.[5] (*Id.* at p. 108-109).

While she is working with NIH towards having this methodology accepted as a forensic diagnostic tool across the country with the goal in mind to gain insurance companies coverage for it, her methods and protocols are standard, routinely used assays in medicine. (*Id.* at p. 27, 29-31). Specifically, her methodology of isolating and quantifying RNA to identify brain biomarkers is routinely used in hospitals and forensic based practices. (*Id.* at p. 27). Accordingly, Plaintiff's assertion that her report should be

---

[5] Dr. Mash also submitted the tissue sample to the United States Drug Testing Laboratory which measured a level of 2.4 mgs per kilogram of cocaine and .21 mgs per kilogram benzoylecgonine, a metabolite of cocaine. The higher level of benzoylecgonine indicates that Thomas used a considerable amount of cocaine immediately before the incident at issue with the Defendant Officers.

excluded because her methodology is unreliable is without any merit. *See Kannankeril v. Terminix International Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (the test for admissibility is not whether the opinions have the "best foundation;" rather it is focused on whether a "particular opinion is based on valid reasoning and reliable methodology.").

Further, while Plaintiff argues "there can be no agitated delirium experts" (Doc. No. 43 at p. 7), there have been numerous prior civil cases in which expert testimony was permitted on the topic of ExD. In fact, there have been other cases within the jurisdiction of Court of Appeals for Third Circuit wherein agitated or excited delirium was determined to be part of an individual's death or where the diagnosis of ExD was undisputed. *See Hannah v. City of Dover*, Civ. A. No. 05-2422, 152 Fed. Appx. 114 (3d Cir. Oct. 11, 2005)(not-precedential); *Watkins v. New Castle County*, Civ. A. No. 03-791 (D. Del. June 16, 2005);

## VII.  Drs. Shakir and Williams Made Their Own Independent Diagnosis

Plaintiff contends that Dr. Mash is not an expert with respect to establishing Thomas' cause of death and should not be permitted to testify as to her diagnosis as an expert. (Doc. No. 43 at 5-6).  First, as discussed above, Defendants are not proffering Dr. Mash as an expert witness under Rule 702. Second, the testimonies of Drs. Shakir and Williams, detailed below, demonstrate that Dr. Mash did not provide a diagnosis and that the Medical Examiner's office made its own independent determination as to the cause of death. Third, there is no dispute as to the qualifications of Drs. Shakir and Williams, both medical doctors, to determine the cause of death.

The Medical Examiner, Karl Williams, M.D. testified that Dr. Mash's methodology for determining the protein biomarker (dopamine transporter and heat shock

protein), when combined with descriptions of the decedent's behavior prior to death, served as an objective method for *assisting* him in determining a cause of death. (Exhibit C at p. 20-24). Drs. Shakir and Williams both testified that they did not need Dr. Mash's study to determine that Thomas' death was caused by acute cocaine intoxication and agitated delirium. (Exhibit B at p. 34-35; Exhibit C at p. 18-23). Rather, they evaluated her test results like any other laboratory test - as a "piece of the whole puzzle of the final wording of the death statement." (Exhibit C at p. 22). This case, as with others, are extraordinarily complex "to sort out" and the doctors exercise their own independent judgment to make a determination, often times with the assistance of additional diagnostic testing. (*Id.* at p. 23-34). It was Dr. Williams' discretion to rely upon or reject the information provided by Dr. Mash in the context of their evaluation, as Dr. Mash does not provide a diagnosis. (*Id.* at p. 27). The numbers presented by Dr. Mash in her report indicated to Dr. Williams that it was a cocaine overdose, which resulted in an arrhythmia. (*Id.* at p. 24, 29). To this end, Dr. Shakir testified that cocaine intoxication can result in sudden death due to many factors and lead to a psychiatric state manifested by extreme delirium, which, in and of itself can cause death. (*Id.* at p. 32). Delirium is a known manifestation of cocaine and its occurrence is not directly linked to the dose of cocaine ingested. (*Id.*). Dr. Williams stated that the level of cocaine concentration indicated there was a recent ingestion of cocaine - within a matter of minutes. (*Id.* at p. 17). And, any level of cocaine is considered toxic and potentially liable to result in death. Aside from the cocaine, there was nothing in the physical autopsy to point to a cause of death. (*Id.* at p. 20).

Dr. Williams discussed the case with Dr. Shakir prior to reaching a cause of death (Exhibit C at p. 31). They did not reach a diagnosis until after they had Dr. Mash's results. (*Id.* at p. 28). They used her report to support their reasoning reached before her test results were received. (Exhibit B at p. 45-48). Drs. Shakir and Williams agreed on a cause of death based on their review of the account of events, the clinical findings and toxicology results. (Exhibit B at p. 29, 45-46; Exhibit C at pp. 11-12). Cocaine use was the "single most important factor" in their decision and it was detected in its "active part" as well as in its "half-life" of benoylegonine, which is an active metabolite of cocaine. (Exhibit C at p. 24-25). Agitated delirium was the other half of the doctors' diagnosis. (*Id.* at p. 25). They testified that using the term ExD does not have much importance – Thomas' death was caused by a complication of acute cocaine intoxication.[6] (*Id.* at 29-30).

## VIII. Conclusion

For the reasons discussed herein, Defendants request that this Honorable Court deny Plaintiff's Motion to Exclude Expert Testimony and Evidence Regarding Excited Delirium, Agitated Delirium and/or Drug-Induced Delirium (Doc. No. 42).

Date:  November 22, 2011                           Respectfully submitted,

                                            CIPRIANI & WERNER, P.C.

                                            BY:   */s/ Mark R. Hamilton*
                                            MARK R. HAMILTON, ESQUIRE
                                            PA ID #29919
                                            CIPRIANI & WERNER
                                            SUITE 700
                                            650 WASHINGTON ROAD

---

[6] Both Drs. Shakir and Williams state that they were aware that Thomas has been subjected to three Tasers and they concluded that this did not cause or contribute to Thomas' demise.

        PITTSBURGH PA  15228

        Attorneys for the Defendants,
        BOROUGH OF SWISSVALE; DEBRA;
        LYNN INDOVINA-AKERLY; JUSTIN
        LEE KEENAN; and GARY DICKSON